Brian A. Scott, student bed 17-0467, Jeremy E. Tindle and Cameron Tindle, plaintiffs' affiliates, Yusof von Barakat, M.D., Northwest Plain and Spine Surgery, S.C., and Atkinson Chairman Hospital, defendants' appellants. On your long behalf, the defendants' appellants, Mr. John A. Tristle. On your long behalf, the plaintiffs' affiliates, Mr. William J. Burke. Good morning, gentlemen. And, Mr. Tristle, whenever you are ready, you may proceed. Justices, may it please the Court. I'm J.A. Tristle and I'm here on behalf of Advocate Chairman Hospital. I know you've all read the brief, so I really have just three points to make today. One, first point, in preparing for today, I reviewed the case law and chronological order that counsel cited and recited, from Roche's 1993 Supreme Court case to the Nielsen case by this Court in 2017. While it's not enunciated as such, it appears that the Medical Studies Act, at issue in the application of it, at issue in this case, has a three-pronged test that it seems like the courts are all looking at, although expressing it in a little different way in each case. I just want to go over that real quick. Point one, or prong one, I think, is circumstances of creation of the document. How, who, and why. Courts all look at that. They take into consideration, was the person who did it a proper designee, especially since the Medical Studies Act has been amended and a designee can be made? In one of the cases, the designee wasn't considered to be proper, and in another one, she was, even though she was risk management. These circumstances of creation include the purpose of it. Is it clearly quality assurance, or in our case, credential and peer review? And these documents, like the Anderson analysis, with those journal articles that were clearly not made for, made before the issues at state, but they were brought into the process inside the peer review, or the quality assurance process that was going on. So they were cloaked with the privilege, and that goes to the circumstances of the creation. In the Anderson case, under the second district's analysis, if a doctor who looked at those articles as he did in the peer review context, they were privileged. But if that same doctor had looked at those same articles, heard about the issue, grabbed the articles off of Lexis or Medical Search, looked at them quick, and then brought them into the peer review process before it all started, I don't think they would have been privileged. It really is the context or circumstance of creation. Well, part of it is timing. Is that going to be... That's prong three, I'm getting there. Okay. So I call it circumstance of creation. Okay. What I call is commingling, or use of the documents. And the Nielsen case is a good example of the last case that this course... Actually, there's another case after that. Even if... I'm just going with the ones we cite. Right. Well, there's one in September... Okay, we might have missed that one. ...of 2017. I'll use the Nielsen example, though. That's a pretty... When I read the case, I thought, I think there were Swedish, American, or the hospital in that case, I thought had done a pretty good job of setting up the system, following the system, creating the report. But where they fell down was, and the analysis is clear, that the report potentially could be commingled or have multiple uses by other outside entities. And that case was simply risk management, and I think the court identified billing possibility, where they're going to write off a bill, as well as legal liability. Right. That was actually one of... It sounded more like one of the primary reasons. Should we charge for this procedure, or should we not charge? And so while what they did in that case had a proper designee, they followed, I think they were working on quality assurance. In the end, the system set up was such it allowed commingling or multiple use, and it didn't fail the standard. Now, as Your Honor noted, the third prong in my analysis from the cases, at least as I see this time, and clearly the cases all talk about, well, if it's before or after them, we know that it's not going to be medical studies, protected by the medical studies. But then the Anderson is an analysis that is taken a step further, and it really looked at, it was a document created before, but it was in the context of its use in that case, it was protected. And so timing becomes very important, and I think that when you apply those cases, or those theories, to our case, this is where the lower court misapplied the claim analysis. I think in claiming, it's some of this as well. But in our case, the affidavit is clear that these were only created, let's start with the purpose, or the circumstances of creation. The document at issue is only created for credentialing. It's not a conversation outside the context of peer review. It's not documents created before or after. Its purpose, or circumstances of creation, is they create this document once the peer review process starts. Secondly, commingling. The affidavit is clear. Unlike in claim, that's a big distinction. There's no commingling here. The document is only created once every two years, when the doctor's credentials is at issue, begins, the process begins, I think he applied in December, I think this document was created in January. So there's no commingling, and it's only created once every two years. Three, timing. Again, this is where the lower court, I think, missed, had an error on the manifest way of the evidence. The affidavit in question, it's more of an affidavit, clearly states that the document is created, it's not kept in the regular course of business, it's created only for purposes of peer review. Unlike the claim case, where I think that's where the judge was kind of following it, here at the trial court level. It's only created after a peer review committee process begins. And so it's not before and it's not after. So when you apply the three-prong test correctly, from Roche to the current case law, I believe that the documents at issue are protected by the Medical Studies Act. That's point number one. But if the documents were simply put into this volume report for ease and convenience, but these documents were all or primarily all created over a period of time pursuant to hospital procedure, why do they become privileged when they get bound up with a pretty three-hole punch or whatever the situation is? Let me correct just one factual point on that. These are not documents that are sitting on the shelf. What they had asked for was all the credentialed documents. What we have is it was created for the peer review committee, credentialed committee, is a summary of all surgeries performed by the doctor in the prior two years. So that's the document that exists. That's the only thing we're saying is privileged. The underlying data, which you're referring to, is not bound. It does not exist anywhere. What we have in this case for this credentialing period is they have the ability computer-wise to scan the system looking for certain, looking for all, they scan the doctor's name, they get his procedure codes and procedure surgeries, and then they gather that data. That specific data is not on a shelf or anything. It's a computer system search that's done every two years for the doctor. Then the document which the medical staff office creates and gives to the credentialing committee, in this case the surgical steering committee, is just a summary. A summary of that data. Of that data. And that's all we're asking to be protected is just that document. We have given them the raw data. That was discoverable. We turned that over. They can count. But the hospital would have access to that data. It's not a record kept in the regular course. All they do is start scanning the doctor's name. What about the attorneys representing the hospital during the litigation? That's me. That's what I'm saying. You'd have access to that. We accessed the data after a discovery request for the underlying data, which is what we provided, to the extent that we could discover it. Some of it was so old that we no longer had the system anymore. So what we gave them then was a different form of report. It wasn't the summary. What we gave them then was a... But you have the summary. I don't. The summary that was read by the credentialing? Yes. In that volume report. Yes. Yes, you have that. I have the volume report. Which you're trying to protect. Exactly. We reviewed it. We created a privilege log. But it's the same data that you're saying they had. They just have it in the actual heart. Yes, what we did is just so you know what they have, we printed out a printout that has the rank of 40 procedures on one page, and then it flips over, and it's like 20 pages long. It goes back to 2006. It lists his name, Dr. Barakat's name, the surgery, the code number, I believe, and I think the date. And that data, they had been given. And I think the distinction is important because what I'm saying is that data is discovered when we gave it. The document that the committee looks at is not. It's information created. What does it have that's different? Because I thought you said the volume report was this computer compilation. No, the volume report is a single page, and it just says, for instance, it will say, for instance in this case, lumbar discectomy or something like that. And then it will say 12. Back injections, steroid injections, 400. So it has the surgery and it has a number. And that's what the committee gets. And so – Well, how does that reveal the workings of the committee? I don't think that's the proper standard. Well, that's one of the issues that is – or one of the factors that's commented on in the statute, isn't it? No. The statute says all information, which is – I can read it for you. It starts with all information and then lists conversations, reports, things like that, that are used, in essence, by a committee, are published. It doesn't say that you have to have the mental impressions of the committee on it. Well, it says confidential assessments of a health care practitioner's professional competence. That's one of the – I read that. What on this one-page number document reflects confidential assessment of a health care practitioner's professional competence? Well, in my opinion, there's nothing written by somebody. But what I would say to that is the committee is looking at certain things. And one of the things that they want to look at is this information. Now, whether a committee member writes on it some – hey, look, I'm using this for 10 percent of my analysis here. Or they don't write on that or they don't make a comment about it, I don't think is written into the statute. I think that's taking the statute and reading something into it. The Anderson case, which protected the journal articles, those articles in and of themselves had no mental impressions of the committee on it. There were some memorandums written about it by the doctor, but the journal articles themselves had nothing on it. But the courts said, well, wait a minute, that's part of the information gathering – it reveals the processes and the mechanisms of the committee's analysis. And it was privileged. But you said – Mine is the same way. It could have – those articles could have been secured just the same way as the doctor who originally found them, going on a medical search or – Absolutely. Like Alexis or whatever. Right. So – So that's what I'm getting to. The document you were pointing to, it doesn't have mental impressions of that. But most of the documents aren't going to have mental impressions. They're not going to be writing within the committee. Committee members don't sit around – surgeons don't sit around and write on a document. They're, this is what I think about it, this is what I think about it. If that were the standard, almost nothing is going to be privileged. I think the protection is, is the document created for the committee? Was it timely, proper in time? Was it commingled? No. Therefore, look, whatever they looked at inside that committee, properly created, is privileged. If you were to ask them, well, let me just take it one step further. Let's say you think that this report isn't privileged. Would you say that you, if you wanted to ask the doctor, depose the doctor, doctor, what would you think of the information in this report? Well, that would be privileged. There's no way that could come out. So why should the decision of whether the document itself is privileged or not rely upon what specifically the document says? That is not what the act says. It does not read into it. There's nowhere in that act that says the mental impressions of the committee have to be contained within the document. Otherwise, it's discoverable. That's reading something in the end. That's what they put in their brief, the appellee put in his brief, and I think that's totally wrong and takes it much further than it should. Well, is this document used in internal quality control or of a medical study for reducing morbidity or mortality or for improving patient care, increasing organ and tissue donation, et cetera? It is part of the act, yes, if you read on. Well, those are the issues. Do these raw numbers that you're talking about on the page, do any of those things? Go into that? Yeah, I would tell you this. I didn't sit in on the committee at the time they set for Dr. Barakat, but let's say they get the raw numbers, okay? Let's say, in this case, one of the privileges requested is discectomy. What if the summary says one discectomy in two years or it says 200 discectomies in two years? To a doctor sitting in that committee thinking of credentialing the doctor, peer review, quality assurance in the future, that may make a difference to that doctor, whether there's one or 200. So that's why the information is provided. What they do with it inside that committee is privileged, and just like what they consider is privileged if it's properly created. All these other cases talk about when you're finding the doctor's not privileged, either this court or the other courts are finding that the process wasn't done right, that there was a conversation outside, that there wasn't a proper designee. But when you get down to the nuts and bolts of what they did inside the committee, like the Anderson analysis is, you're finding it's privileged. The document is properly created for the committee. It shouldn't matter what's written on it. They have the ability to think on their own, whether they want to apply 10 percent of their decision to it or 100 percent. That's up to them. Is there any issue in having these discoverable documents that they have and wanting to check to make sure that the information received here is the same or accurate, that there has not been any, I don't want to use fraud, but any change? To that I would say, as an officer of the court, we did our best to give everything we can to counsel in this case. I don't think the decision under the Medical Studies Act turns into something like that. And I would say one other thing. In the Medical Studies Act, under Roach and your cases, they talk about the hospital might cloak something, and that's the fear here, that it might cloak something admissible and that they may need for the case. That's not the policy at issue in this case. In all those cases, you have an incident, malpractice or a defamation case or whatever, and then you have the review, the hospital potentially privileging something. That's not this case. The hospital privileged a credential doctor bracket in January 2010. The malpractice at issue was in March of 2011. It's reversed here. There is no incentive at the time to make any decisions that have anything to do with the malpractice. That policy concern is not in this case. And as far as checking it, it's... Did you have it in camera? Well, we did it in camera with the judge. I mean, I suppose if that was a step, the judge could check the law data versus the other, the privileged data. That's a possibility. That's usually not what it is in camera. It's just a document. But many things are privileged, and you just have to, I guess, trust the attorneys to do their jobs. And you have a privilege law, and then they bring the case, they bring the motion. I lose at trial court level. We come here, we make the decision here. Whether we stay here, whether we go, regardless. That's a system. Can you use the volume report in the litigation? I'll tell you what, that's another thing that's different about this case than the others. It's a negligent credentialing claim. I am hamstrung, to some extent, by not using the volume report. Without reviewing client confidence, this is what I, this is some of my clientry in terms of defending the case. It would be easier to defend if I produced everything, because then I could show the jury everything that was reviewed. But the client stands under privilege. They own the privilege. This isn't their own case. The Medical Studies Act is very important to my client, and they're defending the privilege all the way. So they're telling you not to use it. I can't tell you that. But, okay. One last thing I would say, if your questions are open, we have a good faith on this one in terms of argument. The trial court felt so, and regardless of how you decide, I would just ask that the contempt be vacated. Why was there a fixed fine as opposed to a daily fine for civil contempt? A fixed fine? A flat fine. I don't know why. Normally, the fine on friendly contempt is a dollar per day or a week or whatever. He came up with, I think, $300. I don't know the reason for it. It's supposed to be persuasive to get you to appeal it or to comply. I thought Judge Murphy handled it properly. We didn't want to appeal it. We came right away. So I don't know why he came to that number. Okay. Anything else? You'll have an opportunity for prior rebuttal. Mr. Burke. Good morning, Justices. William Burke. I guess I would just, toward the end, you would ask a question about, I think you were alluding to you gave him the documents in production and maybe he wants to check it again. Just to sort of keep them honest. I think counsel's comment was he doesn't think the case, Medical Studies Act case should turn on an issue like that. And my response would be they brought it up as a defense to a Medical Studies Act claim that you don't have to find this as not privileged because we've given him all the information he needs. Don't let him worry about it. Trust us. And I don't think that's the way it works. I believe you were right. And we should be able to cross-check with something, especially when it's not privileged. And in this case, I don't think, and that's one of the reasons I was kind of upset with a contempt order. And in a situation like this one, we're basing it on a claim case. And I know this district is certainly not bound by Fifth District. But it's on all fours with this case. It's pretty close because it's a compilation of the volume report, which we now have a different perspective on, but there you have group F, group J, whatever the groups, compilation of information into those reports. And if you look at the description in the claim case of that compilation, I can't really distinguish between the two. And not only that, I think the biggest issue that the hospital has raised is the timing. And they just misread the claim case. And they kind of misrepresent to the court what the case was about because the timing in claim was when, if you look at that paragraph, 34 to 36, when a doctor applies for reappointment, they put together the procedure summaries just like they did in this case. And I think your cases that you talked about, Nielsen and Grosuch. Grosuch is the newer case. Both of those cases dealt with situations where someone outside the committee, the quality committee, started reviewing actions that were brought to their attention. And both based on policies that existed at those two hospitals,  bring it to, and I think the Grosuch case is bring it to the medical staff liaison's attention. And by policy, her job then was to send this to two experts for comment and record the comments and then give her comments in a submission to the committee, who then began their investigation with all that material. And the court said that material collected before the investigation began is not privileged. Well, these two cases, Nielsen and Grosuch, are after your briefs are filed, I think. The Grosuch in particular goes back to Chicago Trust, which is a much older case that says, Documents that are created in the ordinary course of hospital medical business or for later corrective action by hospital staff are not privileged. So they're using previous law to come to these conclusions that, unfortunately, were decided a little after your case but was in the trial court but nonetheless used older cases to come to those conclusions. And, Your Honor, you asked a question about being old school, you know, documents. We all think of documents. And that's the first thing I think of. You know, you ask for, you just take all these documents and put them in summary form and counsel is responsible. There is no document. Well, that's only because we're living, I guess, in an electronic age. But when you think about what happened, you press a button and you're really compiling what used to be paper documents and all the information's there and do a summary form. So it's just raw data. And Judge Murphy saw the raw data. He made a factual finding that there's nothing there other than raw data kept in the ordinary course of business. And like claim, it's not privileged. And I don't believe it's up to the hospital to show that that finding was unreasonable. And certainly, I don't see how it could be unreasonable because there's nothing there other than numbers, sheer numbers. And the Anderson case, which they rely on heavily, is so different from this case because as an attorney, we're all familiar with the word product doctrine. And when we look at what was going on in Anderson, his committee on its own, during their investigation, said let's investigate this. Let's do research and assign people on the committee to do the research into articles dealing with the medicine. Now that, we all know, is word product. It reveals their mental impressions of what they thought was important in the case and where they were going with it. Your position here is that production here would not reveal the inner workings or the process of the review? Not at all. This is no different than a physician sending in an application. He's applying for privileges. Does that show their thought process? Not at all. And as part of that, the packet they put together is his application and his list of procedures that he's performed in the prior two years. And every physician, every surgeon that comes in there and has to be reappointed, they do this. So it has nothing to do with their thought processes on this position. It's simply material that they're going to review. And it's all generated prior to them reviewing it. With respect to the issue of contempt, you're not contesting the position that this is a friendly contempt and we should probably vacate it even if we agree with you. You know, I haven't done this for a long time. I'm not going to find it a friendly contempt because I think it's abused. Do you think it's abused in this case? No. Counsel, I know they're doing their job. The distinctions they make in a claim case, I don't think they're valid. No. Do we prejudge a case then? Pardon? In terms of contempt, is the trial judge to prejudge the case? I mean, the trial judge just made a ruling. And then to say, I think your basis for appeal is so outside the box that I'm going to hold you in contempt? Or is it the method by which the issue is raised? Well, at some point, I think the trial court has to be in a position to say, you're just abusing the system and we're going to find you a contempt. Contempt doesn't have to be friendly, especially when there's no review. What's the rule on filing frivolous claimings? 137. Okay. Well, here, in your response, you don't bicker. You don't even take a position regarding it. And I think you just acknowledged that the trial court didn't make a finding that this was frivolous. Right. And it was an hospital to suggest a term of contempt so they could appeal it. Let's see what the second quote, unquote, see what the second district will say. All right. The trial court actually makes some findings where he could have said, no, you're not going to turn it over. He says it wasn't certain things were distinguished in claim. You didn't distinguish certain things here so that we know exactly what you're talking about and exactly what the issues are. They seem to be, I wouldn't say on all fours, but they're pretty close. That's all I have. Thank you, Your Honor. Thank you. Mr. Kerslake. Yeah, I'll be brief on the frivolous nature of it. They did ask for a partial relief for the pleadings, and the judge, he ruled on that. He said, no, I'm not going to do that. There's a question here. Judge Murphy was very fair. We took the loss, and here we are. You talked about the process to decide if there's a way to verify the assembly that's in the frivolous versus the raw data. Well, he had me in camera. He looked at everything. Then I come here and I give you the records to the appellate court. It can look at everything. There is a check on the whole system of whether a defendant or a party, I'll say, is hiding something. It's called a camera appeal, and that's what we're here for. How do you respond to the argument that there's nothing in these volume reports that would reveal the inner workings or the thinking of the committee? All right. I'll respond to that with this, and I'm going to read from Anderson. The medical journal articles, which the articles themselves did not reveal any inner workings of the committee, contributed to the committee's deliberations in that they were obtained as part of the information-gathering process. And that's also mentioned in several paragraphs earlier, the information-gathering process. And they were considered prior to the development of the action plan. As a result, the disclosure would reveal the committee's internal review process. So the documents, whether they say something about the mental oppressions or not, that is not the standard in the act. And I think the claim case, I want to distinguish that before my time runs out, because I appreciate its importance. It's talking about raw data as well. But in claim paragraph 22, it says a review. First of all, they question the affidavits as being inconsistent. We don't have that problem here. It's very clear. But they say a review of the affidavits does not establish that the information contained within the documents, consisting of a history of the procedures Dr. Dressen performed at the defendant's facilities, would not have been kept in the ordinary course of the defendant's business prior to the credentialing committee commencing their peer review process. There, the court made a finding that it wasn't clear if the summary existed just on the shelf all the time. It's just there. And then they just pulled it off. It's kept in the regular course. Because the defendant didn't make it clear to the court. That goes to the timing prong. It goes to the circumstance-created prong that we talked about. My affidavit, the hospital's affidavit, specifically says that this is not kept on the shelf. This is a report created for the purposes of peer review. It falls within all three prongs. And it is clearly distinguishable from claim on that basis. That language right there. The affidavits were unclear. There was commingling in claim, or at least it wasn't clear that the risk incident data, which the other committee was using as well, made it unclear if this was a commingling case or not. And the defendant in that case is held to perhaps the shoulders. And they're saying right here, we can't say that these didn't exist prior to the process beginning. In my case, I can say it categorically that Judge Murphy was wrong on that point. And the document was created categorically within the peer review process. Therefore, the document falls under the act. That's it. I want to go back. Do you want to talk about this or the contempt? Go ahead. Friendly contempt. And I know it's job security, so I shouldn't be too upset about it. But I don't know how many hospitals there are in the state of Illinois, but I assume that it's over 1,000. Let's just put it at that. Does that mean that every time this issue comes up in a different hospital, they can bring friendly contempt even though it's been decided by that court in four other hospitals in the district or it's been decided by the Supreme Court across the state? Well, you have a gatekeeper. It's called the trial court. They'll make the decision. I left it to Judge Murphy, but I will say there's a difference in your analysis in this case. There's only the Fifth District that's spoken on this only. As to this particular set of facts close to our case. Well, I think you need to look at the Gross Hutch case. That didn't happen. I know. It came out in September. You said you did a chronological review. You just missed one. It's pretty close. I just looked at what we had here. Right. But because you have a gatekeeper to friendly contempt, and that's the judge. If he had said, no, I'm not going to find that, then that's a whole different ballgame. And so we'll have to deal with that at that point. So I don't think you're going to have a – and I'll be honest. In my 25 years of practice, this is the only privilege case I've brought to the court. But it's not my only friendly contempt. We've had others. Probably have been two or three in my career. So long streak of the Supreme Court. So it's a method. It's a tool to use. And it's there. Did you have any questions? Just to be crystal clear, there is all the data about a given physician that's kept in the regular course of business. On this date, I did this procedure. This was the patient's name, the outcome, the entire file on each procedure. Some of the medical record? Yes. The patient's medical record only? Yes. Yes. Okay. But it's out there. And it's kept in the normal course of business, et cetera, et cetera. What this does is basically look at all of the computer records of the hospital. And just like when you filter something, you said, all I want is Dr. Jones. Surgery. I beg your pardon? Dr. Baraka's surgery. Right. You'd say, I'm looking for Dr. Jones. I'm looking for surgeries. I'm looking for this. And then this program creates the document in question. Is that pretty much? Well, during two years, that's what happens. Right. But that's the mechanism by which it's created. That's the mechanism. It's not a show. Yes, I agree. Right. And your position is, it's not new data, but the compilation of it is what is unique and is used just for the credentialing. Absolutely. It's not new data. Nothing is ever new data. Nothing is created inside the context of the Privileged Peer Review Committee or even the Quality Assurance Committee, really, except maybe the analysis of these articles. It's always taking data that exists somewhere and bringing it into the committee and have them review it. And that's exactly what happens. Once every two years, they run those things. They give the committee this data. But we would say it exists somewhere. The law. If that somewhere is accessible prior to the peer review. It's not, Your Honor. HIPAA protects us from doing certain things with patient information. Right. We can't go as a hospital and, I guess, for some reason, unconnected to a peer review, start running what everybody's surgeries are. In fact, in defending medical malpractice cases, I can't ask the hospital, tell me how many of these cases you've done. Give me this data. They won't run the information. HIPAA protects all that. This is a unique situation because it's called peer review. And there's a statute that allows the hospitals to do these kinds of things. In a very narrow sense, I can't get the raw data to defend the doctor in another case. So then I can say to the people, hey, look, the hospital's got all these surgeries for this. That can't be done. That's only in this context after peer review starts. That's why it should be privileged. It's one of the documents I'm asking privilege. Nothing else. What happens to the report? It remains in the credential file only. As I created a privilege log, we can see it. But it remains in his personal credential file. Who's we? You say we can see it. We can see it for purposes of determination of extending credentialing? It's used by the credential committee at one time. Then when it's done, and he's either credentialed or not, that document remains in the physician's, I guess, credential file. Then if there's a subpoena for it 10 years later, I produce it. The hospital produces it. We have this discussion we're having here today. But it does not go from the credential file. Anywhere else? It doesn't go to anybody. It doesn't go to the only department of IVFPR. It goes nowhere until presumably two years later, and the credentialing file is reopened, theoretically. Theoretically. I don't know if they go back and look at the old ones. But that would be its only purpose. Only purpose. And it remains in one spot. It's not like some of these other cases. It wouldn't go to the state if there was a licensure issue, a suspending license? I suppose if the state asked, not that I know of, as far as I know, but if the state subpoenaed the license, the credentialing file, we might have the same discussion with the state of Illinois on this issue. We wouldn't be asserting the Medical Studies Act of applicable in any situation. So I have to think that through. I don't know the answer. But I think it would. I think we would be here with the state of Illinois asking for it. Good evening. Thank you, counsel, for your argument. We will take the matter under advisement. We have learned a great deal today. We will get a decision to you in due course. Thank you. We now stand adjourned.